Magistrate Judge Brian A. Tsuchida

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

ALI KUYATEH, et al.,

Defendants.

NO.    CR24-186 JHC

UNITED STATES' MEMORANDUM
IN SUPPORT OF DETENTION

## I.    INTRODUCTION

The United States respectfully submits this memorandum in support of its motion for detention for defendants Kuyateh, Sherman, Saho, and Means. This memorandum will provide a brief overview of the investigation that led to these charges, summarize the applicable law (which is of course well known to the Court), and then address facts and circumstances presently known to the government regarding each defendant that support that defendant's continued detention.

## II.    BACKGROUND OF THE INVESTIGATION

This investigation arose from a drug trafficking investigation initially conducted by federal and state investigators in the Western District of Pennsylvania (WDPA). As a result

U.S. Memo in Support of Detention - 1
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

of that earlier investigation, on December 20, 2022, twenty-nine defendants were charged in the WDPA for violation of Title 21, United States Code, Section 846, Conspiracy to Distribute Controlled Substances, and other federal offenses. *See* WDPA Case No. CR22-021. The WDPA conspiracy spanned several states, including Pennsylvania, Arizona, and Washington.

One of the leaders of the Washington arm of the conspiracy was Bryce Hill. Intercepted communications over Hill's cell phone, from December 1, 2022, to January 11, 2023, revealed that Hill was a prolific narcotics distributor in this District. Based on evidence gathered in the prior investigation, agents estimate Hill was receiving and redistributing approximately one million fentanyl pills every seven to ten days. The investigation also showed that Hill was distributing significant amounts of cocaine and methamphetamine.

Hill was charged in the WDPA case and arrested in Seattle on January 11, 2023. Based upon evidence obtained from the forensic analysis of Hill's cell phone—among other means—investigators learned that there were numerous co-conspirators in Western Washington with whom Hill was working to distribute drugs prior to, and after, his arrest. Among Hill's co-conspirators identified in the subsequent Western District of Washington investigation was Amir Osman.

The investigation into Osman, and his co-conspirators resulted in three rounds of wiretaps that targeted Osman, Muhammed Ceesay, Lamin Saho, and Ali Kuyateh, as detailed below:

| Target Account/ Target Telephone | User | Interceptions Began | Interceptions Terminated |
|---|---|---|---|
| TA14 – Snapchat user account "twoprezz" | Amir Osman | May 8, 2024 | June 6, 2024 |
| TT30 – (206) 751-9426 | Muhamed Ceesay | June 26, 2024 | July 25, 2024 |
| TT35 – (206) 683-2980 | Ali Kuyateh | August 12, 2024 | September 10, 2024 |
| TT35 – (929) 371-1019 | Lamin Saho | August 12, 2024 | September 10, 2024 |
| TT45 – (206) 255-0855 | Muhamed Ceesay | August 12, 2024 | September 10, 2024 |

U.S. Memo in Support of Detention - 2
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

On June 24, 2024, as investigators were preparing to begin the second round of interceptions over a phone used by Osman's close associate—Muhamed Ceesay—Osman was shot and killed outside an apartment in the University District of Seattle. As detailed further herein, subsequent investigation showed that this apartment—located at 650 NE 42nd and referred to as "the house"—was a DTO distribution hub operated by Ali Kuyateh, Yohannes Wondimagegnehu, and Matt Robinson.

Interceptions over Ceesay's TT30, as well as physical and electronic surveillance conducted in the weeks following Osman's death, showed that—after a short hiatus—members of the DTO returned to business as usual, i.e., the distribution of significant amounts of fentanyl, and other controlled substances, throughout the District. Indeed, in the two-month period following Osman's death, investigators seized—from DTO members—nearly 100,000 fentanyl pills and multiple firearms.

 On October 16, 2024, a grand jury in the Western District of Washington charged Ali Kuyateh, Muhamed Ceesay, Cooper Sherman, Lamin Saho, Oche Poston, Alvin Whiteside, Jaquan Means, Dominique Sanders, Patrick Smith, Matthew Robinson, and Yohannes Wondimagegnehu, in a fifteen-count Indictment with, *inter alia*, Conspiracy to Distribute Controlled Substances in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A), (b)(1)(C), and 846. *See* CR24-186 JHC, Dkt. 1.

On October 30, 2024, investigators conducted coordinated arrests and searches throughout the District. During these searches, law enforcement seized additional drugs, firearms, and drug trafficking proceeds. Though investigators are still tallying totals from the searches conducted on October 30, 2024, it is estimated that during the yearlong investigation, law enforcement seized at least:

- 200,000 fentanyl pills
- 31 kilograms of psilocybin mushroom
- 4 kilograms of cocaine
- 20 kilograms of marijuana

U.S. Memo in Support of Detention - 3
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

- 60 firearms, several Glock "switches," and multiple suppressors
- $250,000 in cash drug trafficking proceeds

### III.    LEGAL STANDARDS FOR DETENTION

This Court is of course quite familiar with the legal standards governing detention or release. To summarize, the Bail Reform Act provides that a court should detain a defendant pending trial if "no condition or combination of conditions . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). The United States typically bears the burden of showing that a defendant poses a danger to the community by clear and convincing evidence, and it bears the burden of showing that a defendant poses a flight risk by a preponderance of the evidence. *United States v. Gebro*, 948 F.2d 1118, 1120 (9th Cir. 1991).

The Bail Reform Act identifies four factors that a court should consider in analyzing detention issues: "(1) The nature and circumstances of the offense charged, including whether the offense . . . involves a narcotic drug; (2) the weight of the evidence . . . ; (3) the history and characteristics of the person, including . . . family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, . . . ; and . . . (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release . . . ." 18 U.S.C. § 3142(g). Of these factors, the weight of evidence is least important, and the statute neither requires nor permits pretrial determination of guilt. 18 U.S.C. § 3142(g).

As noted above, the government generally has the burden of proof and persuasion regarding detention. However, each of the defendants discussed herein has been charged with one or more serious Title 21 offenses—and in defendant Sherman's case, two counts of firearms offenses under Section 924(c). As to those charges, the Bail Reform Act expressly provides that:

U.S. Memo in Support of Detention - 4
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

[s]ubject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 *et seq*.) . . . or an offense under section 924(c) . . . of title 18 of the United States Code . . .

18 U.S.C. § 3142(e). The return of an indictment is sufficient to support a finding of probable cause, triggering the rebuttable presumption. *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985); *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986); *United States v. Stricklin*, 932 F.2d 1353, 1354 (10th Cir. 1991).

In a case where the presumption applies, Courts have found that the *defendant* bears the burden of producing evidence that he does not pose a danger to the community or risk of flight in order to rebut the presumption. *See United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003); *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir.2001); *Stricklin*, 932 F.2d at 1354. The government retains the burden of persuasion. *Mercedes*, 254 F.3d at 436.

However, even if a defendant has met his burden of production relating to these two factors, the presumption favoring detention does not disappear. Rather, it remains a factor to be considered among those weighed by the district court. *See Stricklin*, 932 F.2d at 1354-55; *Mercedes*, 254 F.3d at 436; *United States v. Rueben*, 974 F.2d 580, 586 (5th Cir. 1992). If the presumption were to vanish once a defendant produced *some* evidence, courts would not give adequate deference to the fact that Congress has determined "that drug offenders pose a special risk of flight and dangerousness to society." *United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir.1986); *United States v. Hare*, 873 F.2d 796, 798 99 (5th Cir.1989).

Finally, it is well settled that at a detention hearing the government may present evidence by way of an evidentiary proffer sufficient to make the court aware of the defendant's role in the offense, the weight of the evidence against the defendant, and other relevant factors. *See, e.g. United States v. Salerno*, 481 U.S. 739, 743 (1987); *United States v. Winsor*, 785 F.2d 757 (9th Cir. 1986); *United States v. Cardenas*, 784 F.2d 937 (9th

U.S. Memo in Support of Detention - 5
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

Cir.), *vacated as moot upon defendant's conviction*, 792 F.2d 906 (9th Cir. 1986). The statements of fact herein, which are based on the wiretap and search warrant affidavits sworn to the Court, and a summary of the results of said searches, is presented as such a proffer.

## IV.    INDIVIDUAL DEFENDANT ROLES AND ANALYSIS

The following defendants present particular risks of flight and/or a danger to the community due to their role in the offense, criminal history, possession of firearms, or some combination of the above.

### A. <u>**ALI KUYATEH**</u>

The investigation shows that Kuyateh was a leader and prolific dealer within the DTO, and—until the time of his arrest—operated two drug-involved premises in the University District of Seattle. Based upon his central role within the DTO, Kuyateh is charged with conspiring to distribute A-level amounts of fentanyl.

The first drug-involved premises that Kuyateh operated and controlled—which DTO members referred to as "the house"—was a unit within an eight-plex apartment located at 650 NE 42nd Street (pictured below). As discussed above, Osman was shot and killed outside "the house" in June 2024.



According to SPD detectives, "the house" has been an "open air drug market" for many years. Moreover, "the house," was also used in the filming of a hip hop video made

U.S. Memo in Support of Detention - 6
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

by Big Sad, a Playboy Gangster Crip from Los Angeles. References to drug use—to include "juice" or "lean" (the street name for a drink that contains promethazine syrup with codeine, soda, and hard candy), fanned cash, the display of multiple firearms, as well as several targets of this investigation, are featured in this video.[1] A key line in the track's chorus is, "[e]very n***a got a switch[2] every n***a got a beam[3] (pow pow pow)."

Numerous intercepts reflect that prior to October 30, 2024, "the house" was operated by Ali Kuyateh, Yohannes Wondimagegnehu, and Matthew Robinson. Intercepts further reflect that "the house" was known and used, not just by the distributors in this organization and other drug trafficking organizations, but by redistributors and drug users who visited "the house" to purchase smaller quantities.

The second drug-involved premises operated by the DTO was referred to as "the office," and was a room in an "apartment complex" located at 4111 11th Ave NE (pictured below).



---

[1] The video was uploaded to YouTube in 2023 and is available at https://www.youtube.com/watch?v=YU7jToo7rXo. Last viewed on November 2, 2024.

[2] A "switch" is an illegal after-market part that converts a Glock handgun into a machinegun that fires fully automatically.

[3] A "beam" is a laser sight attached to a firearm that projects a beam of light onto a target to make sighting easier—particularly at night.

U.S. Memo in Support of Detention - 7
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

Physical and electronic surveillance of Kuyateh showed that he operated the house six days a week and kept daily "business hours" from the mid-afternoon to early morning. "The office" was immediately adjacent to buildings owned by the University of Washington. Pole camera video from August 2024 reflects there was often a line of people—many appearing to be college-aged—waiting outside "the office" to be let inside.

Intercepts reflect that Kuyateh, Robinson, and Wondimagegnehu distributed numerous controlled substances at the "the house" and "the office," to include cocaine, methamphetamine, oxycodone pills ("real deals"), ketamine, "lean," and marijuana.

Intercepts also reflect that co-defendants Ceesay and Sherman purchased drugs from Kuyateh (e.g., oxycodone pills, Adderall, Xanax) and that Kuyateh routinely obtained fentanyl pills from Ceesay for specific buyers.

For example, in August 2024, Kuyateh contacted Ceesay about a buyer who had $20,000 to purchase fentanyl pills. In a series of calls, they discussed the buyer's preferred price, 50 cents per pill (i.e., approximately 40,000 pills). Ceesay told Kuyateh he could get them from "the Mexicans" for that price but "we not gonna make nothing." Ceesay nevertheless confirmed the deal: "if he got the bread, I can go pick it up real quick."

In another intercept, at a time when buyers were complaining about the low quality of their fentanyl pills, Kuyateh told Ceesay "the one I take from you for that guy … he say it's no good." Ceesay then advised Kuyateh to tell the buyer "the shit is strong" but "it have a taste." Kuyateh then indicated that he would relay that to the buyer.

Additional intercepts show that Kuyateh was aware of an August 2024 seizure of 70,000 fentanyl pills from a storage unit controlled by Ceesay. Specifically, during a conversation with co-defendant Wondimagegnehu, Kuyateh indicated that he [Ceesay] "don't think that is law. He think [*sic*] that is somebody else." Wondimagegnehu asked "[o]ur people?" and Kuyateh confirmed "[y]eah, you know they've been blaming some … some Gambians, whatever." Kuyateh then said, "they just took all of the work" [presumably referring to the 70,000 fentanyl pills agents seized from the locker]. Kuyateh

then opined the break-in occurred because, "they've been telling each other where they puttin' their shit," further remarking … "[t]hey're the dumbest criminals I've ever seen, dawg."

Kuyateh was also a close associate of another member of this organization—Cooper Sherman. Intercepts and surveillance reflect Kuyateh and Sherman met regularly over the course of the investigation. For example, on August 20, 2024—following the seizure of drugs and firearms from Sherman's residence in May 2024 (discussed below)— investigators observed Sherman and Kuyateh together conducting a suspected drug trafficking transaction. During this suspected exchange of drugs and/or drug trafficking proceeds, Sherman ditched his car in an in effort to evade surveillance. Later that night, in an intercepted call, Kuyateh and Sherman commiserated about their close call with law enforcement.

In another call intercepted that night, Kuyateh told Ceesay about being with Sherman and "shaking" law enforcement. Ceesay warned Kuyateh to stop meeting with Sherman: "that n***a hot," "when you with him unc, that's the problem" "those people are watching him."

During the search of Kuyateh's residence, on October 30, 2024, investigators seized a loaded subcompact .380 caliber firearm—that was underneath clothes on top of a bedroom dresser, as well as suspected drug trafficking proceeds (pictured below).

 

U.S. Memo in Support of Detention - 9
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

The government would note that the location, loaded condition, and subcompact size of the firearm, suggest that this firearm may have been Kuyateh's daily carry weapon. And, as the Court is aware, guns and drugs present a particularly volatile combination, as those involved in drug trafficking often use their firearms to collect drug debts and to protect themselves, their substances, and their profits from theft.

Investigators also seized distribution amounts of marijuana, oxycodone (or counterfeit oxycodone) pills from a jacket that was located on a bed in one of the residence's bedrooms, as well as a variety of pills located in a different part of the residence (pictured below).

  

The facts set forth above establish that Kuyateh is both a danger and a flight risk. With respect to danger, Kuyateh operated two drug-involved premises—in close proximity to student housing and other university buildings—where members of this DTO, and others, distributed myriad controlled substances. Unfortunately, but not surprisingly, DTO member Amir Osman was shot and killed outside one these locations earlier this year. Moreover, neither Osman's shooting death outside "the house," nor the multiple enforcement actions conducted by law enforcement from May – August 2024 (of which Kuyateh was aware based upon intercepted communications), deterred Kuyateh from continuing his prolific drug trafficking activities. Indeed, during the 30-day intercept of Kuyateh's TT35 (August – September 2024) investigators intercepted hundreds—if not thousands—of communications relating to drug trafficking resulting in more than 8,000 pages of linesheets. Kuyateh's leadership role in this DTO, his trafficking in several types

U.S. Memo in Support of Detention - 10
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  of controlled substances, and possession of a firearm clearly demonstrate that Kuyateh is a

2  danger to the community.

3    With respect to flight risk, Kuyateh's ability to operate as a prolific drug trafficker—

4  likely for years—demonstrates his skill and sophistication. As discussed above, Kuyateh

5  and other members of this DTO were acutely aware of law enforcement presence

6  throughout this investigation, and repeatedly engaged in measures to evade surveillance.

7  Moreover, Kuyateh's own sense of himself as a sophisticated drug trafficker is clearly

8  demonstrated during intercepts with co-defendant Wondimagegnehu when Kuyateh

9  remarked that Ceesay and others were, "the dumbest criminals I've ever seen."

10    Additionally, Kuyateh currently faces a ten-year mandatory minimum. And, though

11  not currently charged with a firearms offense, the condition and placement of the pistol

12  seized from Kuyateh's residence on October 30, 2024, supports a charge under Title 18,

13  United States Code, Section 924(c). As such, the evidence seized from Kuyateh's residence

14  may increase his sentencing exposure and his potential risk of flight.

15    Balanced against Kuyateh's sophistication and the significant jail time that he faces,

16  the government is not aware of significant family ties, job history, or residential history,

17  that would mitigate Kuyateh's risk of flight.

18    Ultimately, Kuyateh presents a danger to the community and a risk of

19  nonappearance, and he should be detained pending trial.

20  **B. <u>COOPER SHERMAN</u>**

21    The investigation shows that Sherman was one of the DTO's significant distributors

22  and was armed with multiple firearms while he engaged in such drug trafficking activity.

23  Based upon this conduct, Sherman is charged with conspiring to distribute A-level amounts

24  of fentanyl, two counts of possession of fentanyl with intent to distribute (A-level), one

25  count of carrying a firearm during and in relation to a drug trafficking crime, and one count

26  of possession of a firearm in furtherance of a drug trafficking crime.

27

U.S. Memo in Support of Detention - 11
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

As discussed below, agents searched Sherman's vehicle and apartment in May 2024. During those searches, investigators seized significant quantities of fentanyl, drug trafficking proceeds, and multiple firearms. Additionally, investigators seized three cell phones. A review of these devices showed Sherman was engaging in drug trafficking activity with numerous members of this DTO throughout the first part of 2024.

For example, on February 2, 2024, Sherman texted an uncharged DTO member: "[y]up meet me at dicks I'm just grabbing some out tht spot nd coming tht way." A minute later, this individual texted "bring the F." Sherman immediately replied "yup… all 4." Of note, based upon physical and electronic surveillance, investigators know that members of this DTO frequently conducted narcotics transactions at the Dick's Drive-In on 45th Street in Seattle.

Additional text messages in Sherman's phones, dated in April and May 2024, further reflect he was coordinating drug trafficking activities with Khaliil Ahmed.[4] In one exchange, Ahmed told Sherman he might need "2 meals [presumably 2,000 fentanyl pills] later" because he has "a play for .75" [presumably a buyer who will pay 75 cents per pill]. Sherman confirmed, telling Ahmed to "just lmk hit me when u pop out I'm moving around." And later, when Ahmed texted he is "[h]eaded to uw. Here in 1 min this n***a keep blowing me up[,]" Sherman responded "[b]et ima come out[.]" In a later text exchange, Sherman told Ahmed "ima call u later tonight and we'll get everything straight[.]" Ahmed acknowledged but asked "I thought u said you got it off for 65" [presumably sold fentanyl pills for 65 cents per pill]. Sherman replied "[n]ah 60 cuz it was the last shit" [possibly referring to a batch of lower quality pills]. Sherman then told Ahmed "whatever I get it off for [presumably the proceeds from selling the rest of his current supply] I give to u[.]

---

[4] On October 16, 2024, Ahmed was charged with four counts of Unlawful Possession of a Firearm and/or Ammunition. *See* CR24-187 RAJ, Dkt. 1.

U.S. Memo in Support of Detention - 12
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

Sherman's phones also contained apparent pay-owe ledgers in which Sherman was tracking drug-related expenditures and payments to other members of the DTO—to include Ali Kuyateh and Lamin Saho, discussed herein. Screenshots, along with a key to the DTO members' nicknames is included below.



On May 20, 2024, agents observed a transaction in which Sherman met with two targets of this investigation inside a car in the Wallingford neighborhood of Seattle. When Sherman returned to his own car, he was carrying a bag that he placed in the trunk. After the other two individuals left in their respective cars, agents interdicted Sherman and searched his car on probable cause it would contain evidence of drug trafficking. They seized a firearm that was on the driver's side floorboard, as well as 5.32 kg of fentanyl pills that were in vacuum-sealed bags inside a bag in the trunk (pictured below). The firearm was loaded with a 16-round magazine and had another round in the chamber.

 

U.S. Memo in Support of Detention - 13
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

On May 22, 2024, investigators searched—pursuant to federal warrant—Sherman's apartment in Ballard. During that search, investigators found and seized 3.611 kg of fentanyl pills, three firearms, and approximately $126,000 in currency. Two of the firearms were found in a closet near the door. A loaded Glock 19, with an extended magazine and a "switch" was found in the kitchen within feet of both the fentanyl pills and drug proceeds (pictured below).



As discussed above, in August 2024—and notwithstanding these seizures—Sherman continued to meet with Kuyateh to engage in suspected drug trafficking transactions.

Moreover, the search of Sherman's apartment on October 30, 2024, confirmed that Sherman was not in any way deterred by the May 2024 seizures. Specifically, when investigators searched the same residence that had been searched in May 2024, investigators again seized suspected controlled substances, drug trafficking proceeds, several rifle and pistol magazines, as well as a significant amount of 5.56 x 45 and 9mm ammunition—including hollow-point rounds (pictured below).





U.S. Memo in Support of Detention - 14
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970



Additionally, next to suspected Xanax pills, investigators also located a fake Connecticut driver's license bearing a picture of Sherman (picture below)—investigators had observed a picture of a similar fake identification card in one of the phones seized from Sherman in May 2024. Finally, in a box in a closet, investigators also located a stack of apparent blank Washington prescription script (pictured below).



The facts set forth above establish that Sherman is both a danger and a flight risk. With respect to danger, investigators seized significant amounts of controlled substances from Sherman's vehicle and residence in May 2024. Both locations contained firearms. Significantly, among the three firearms found at Sherman's residence was a Glock with a high-capacity magazine and a "switch"—apparently making the weapon capable of fully automatic fire. Further demonstrating the danger that Sherman poses to the community, investigators seized additional suspected controlled substances from Sherman's residence in October 2024, substantial amounts of ammunition, as well as multiple loaded rifle and pistol magazines—suggesting that Sherman acquired these items after the May 2024 search or had them stashed in a location not known to law enforcement.

U.S. Memo in Support of Detention - 15
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

Regarding flight risk, as currently charged, Sherman faces a mandatory minimum term of imprisonment of fifteen years. Of note, though not currently charged as such, because the Glock 19 pistol at Sherman's apartment had a "switch"—and likely was capable of firing fully automatically—Sherman may be subject to a Section 924(c) charge with a mandatory minimum term of thirty years. *See* 18 U.S.C. § 924(c)(1)(B)(ii). Finally, that Sherman possessed a fake identification, and had blank prescription script at his residence in October 2024, further demonstrates his efforts to evade law enforcement detection, and a predisposition to evade the significant sanction that he faces if convicted of the charged offenses.

Ultimately, Sherman presents a danger to the community and a risk of nonappearance, and he should be detained pending trial.

### C. <u>LAMIN SAHO</u>

Saho was one of the DTO's significant distributors and is the uncle of Muhamed Ceesay who is a fugitive in this matter. Based upon intercepts, and two interdictions, Saho is charged with conspiring to distribute A-level amounts of fentanyl, distribution of fentanyl (A-level), and possession of fentanyl with intent to distribute (A-level).

Though Saho interacted with several members of the DTO, his closest associate in the DTO was his nephew (Ceesay) who often supplied Saho with pills. For example, in one intercept, Ceesay pestered Saho to pay him for pills he has supplied: "bring me my fucking money" "I want to go buy some bro. I can't buy." Saho responded that he "hasn't even sold yet" "I have the job just relax" "I'm about to meet some people. Damn!" In another intercept, Saho and Ceesay discussed a plan to sell pills to an individual who would be sending the pills to Alaska for distribution. In this intercept, SAHO remarked, "[g]ood money there," to which Ceesay replied, "[y]es. So we can go through him and I will buy work for us, boy."

As noted above, investigators conducted multiple interdictions in which Saho was involved—the first occurring on August 13, 2024. On that date, investigators intercepted

communications between Saho and Dominque Sanders—who is also a fugitive in this matter—that reflected they were planning a drug transaction. Specifically, Sanders told Saho, "I want ten, bro" [presumably referring to 10,000 fentanyl pills] to which Saho responded "[u]m, give me a few … I'll put it together for you." In subsequent communications, Saho and Sanders agreed to meet at Cascade Coffee in Everett to conduct the deal.

Shortly after these intercepts, agents conducting surveillance at Cascade Coffee observed an individual—later confirmed to be Sanders—get out of Saho's vehicle and put something in the trunk of his own vehicle (a Chevy Impala). After Saho left the area, agents maintained surveillance on Sanders, who went inside the Cascade Coffee and eventually came out with another individual. Sanders then drove to a nearby 7-Eleven, made a purchase inside, and returned to the Cascade Coffee.

After Sanders returned to Cascade Coffee, agents searched Sanders' vehicle on probable cause they would find evidence of drug trafficking. In a bag in the trunk, agents found a Ziploc bag containing approximately 10,000 fentanyl pills (1088 grams), which appear to be the pills Saho delivered to Sanders. The bag also contained suspected heroin, cocaine, a digital scale, and a significant amount of cash (pictured below).



U.S. Memo in Support of Detention - 17
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

Later, On August 20, 2024, agents intercepted communications between Saho and Patrick Smith—who is also a fugitive in this matter—that reflected they were planning a drug transaction. Smith requested "5,000" [presumably fentanyl pills] from Saho. In a subsequent communication, Saho told Smith he was going to "go meet up with" "Mo" [Ceesay] and "grab it from him." Agents established surveillance at CEESAY's apartment in Lynnwood and observed SAHO come out of the apartments carrying a green tote bag that he placed in the trunk of his vehicle. Agents followed Saho as he travelled to Seattle.

A subsequent communication between Saho and Smith reflected they would be meeting outside Smith's apartment. Agents established surveillance there and observed Smith come outside and get into the front passenger seat of Saho's car. Agents interdicted them before the planned transaction occurred and searched Saho's vehicle on probable cause they would find evidence of drug trafficking in Saho's car. During that search, they found the green tote with a black plastic bag inside that contained five Ziploc bags containing approximately 5,000 fentanyl pills that Saho had sourced from Ceesay and planned to deliver to Smith (pictured below).

 

This enforcement action did not deter Saho from continuing to engage in drug trafficking activities. Specifically, on or about August 29, 2024, investigators intercepted communications suggesting that Saho had been resupplied with additional fentanyl pills.

U.S. Memo in Support of Detention - 18
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Investigators attempted to conduct an interdiction action involving Saho's suspected

2    supplier, but that individual evaded investigators as they attempted to stop his vehicle.

3          Moreover, when investigators searched Saho's residence[5] on October 30, 2024, they

4    found evidence of Saho's continued drug trafficking. Specifically, investigators found two

5    vacuum-sealers, vacuum-seal bags, a digital scale, as well several loose suspected

6    counterfeit M30 pills in various locations throughout the residence—including in the toilet,

7    and next to the toilet, in Saho's bathroom—suggesting that Saho may have disposed of

8    most of the pills that he possessed as investigators were executing the search warrant at the

9    residence (see pictures below).



19         Additionally, though investigators did not locate a firearm in the residence, they did

20    locate a large knife (on Saho's bedside table) and a machete (wedged between the mattress

21    and the bedframe) in Saho's bedroom (pictured below). They also located a 9mm bullet

22    and a pistol magazine in Saho's vehicle.

23    //

24    //

25

26    [5] The residence where Saho was arrested on October 30, 2024, belongs to one of Saho's sisters.
      However, Saho appeared to be the only person living at the residence at this time, as most of the
27    rooms were empty and did not contain furniture.

U.S. Memo in Support of Detention - 19                    UNITED STATES ATTORNEY
*U.S. v. Kuyateh, et al.*, CR24-186 JHC                   700 STEWART STREET, SUITE 5200
                                                          SEATTLE, WASHINGTON 98101
                                                          (206) 553-7970



The facts set forth above establish that Saho is both a danger and a flight risk. With respect to danger, in August 2024, Saho distributed, or attempted to distribute, significant amounts of controlled substances. As the case with other members of this DTO, law enforcement intervention did not deter Saho in the slightest. Moreover, though Saho did not possess a firearm at this residence, he did possess two dangerous weapons—a large knife and a machete.

Saho's criminal history also suggests that, independent of his drug trafficking activity, he may pose a danger to the community on two separate bases. First, Saho has multiple arrests for alcohol related driving. These arrests have resulted in a conviction for Physical Control (2023) and a pending deferred prosecution for Driving Under the Influence ("DUI"). Moreover, during the monitoring of Saho's TT37, investigators intercepted communications suggesting that Saho could not start his car (because he had been drinking and the installed interlock device had detected alcohol on his breath) and also had someone else blow into the Interlock device to defeat it. Second, on September 2, 2024, Saho was arrested for Assault in the Fourth Degree—a matter currently pending in King County District Court. During the search of his residence, investigators located a

U.S. Memo in Support of Detention - 20
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

document from a local casino indicating that Saho had been barred from the property because he had assaulted a casino employee.

Regarding flight risk, Saho faces three separate charges which each carry a mandatory 10-year sentence. Additionally, the Pretrial Services Report indicates that Saho has an alternate name, seven alternate dates of birth, and two alternate social security numbers. Moreover, in addition to committing the alleged offense conduct while on court supervision in Washington (for a pending DUI), Saho has arrest history in three different states, and is currently a fugitive in a 2023 Rhode Island matter in which he is charged with conduct relating to drug trafficking.

Additionally, though it appears that Saho claimed birth in the United States to U.S. Pretrial Services, according to government databases, Saho is not a U.S. Citizen. Rather, immigration records indicate that, on or about August 22, 2002, Saho was admitted to the United States as a non-immigrant visitor from The Gambia. These same records show that Saho overstayed that visa and has not otherwise adjusted his status to that of a Lawful Permanent Resident.

Finally, the government would also note that three individuals most closely associated with Saho in this investigation—Ceesay, Sanders, and Smith—are all fugitives in this matter, and may be in position to assist Saho with his flight from prosecution should Saho be released.

Ultimately, Saho presents a danger to the community and a risk of nonappearance, and he should be detained pending trial.

**D. JAQUAN MENAS**

As detailed below, in July 2024, Means coordinated multiple drug trafficking transactions involving Ceesay, Poston, Whiteside, and an uncharged co-conspirator—Shannon Johnson. Based upon intercepts, and one interdiction, Means is charged with conspiring to distribute A-level amounts of fentanyl and distribution of fentanyl (A-level).

U.S. Memo in Support of Detention - 21
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

On July 9, 2024, investigators intercepted communications between Ceesay and Means relating to a suspected deal involving 5,000 fentanyl pills. Specifically, during intercepted calls, Means told Ceesay that he (Means) had buyer (Alvin Whiteside), and further explained, "this will be a set thing for you, bro … I'm hooking you up" "this will be all the time for you too, bro … because he gon' fuck with you" and "he be having a plug too." Additional intercepts show that Means negotiated pricing for the deal, provided Ceesay with the address for the transaction, helped Ceesay navigate to the address, described Whiteside's car so Ceesay could identify it, and remained on the phone with Ceesay throughout the deal.

Contemporaneous with the above-described intercepts, investigators responded to the location of the planned deal between Ceesay and Whiteside. While conducting surveillance, investigators observed Ceesay exit his car with a bag in his hand. Investigators then watched as Ceesay entered Whiteside's vehicle, while Means talked Ceesay through the deal as discussed above. Upon conclusion of the deal, investigators observed Ceesay exit Whiteside's car and return to his own vehicle, without a bag in hand.

Shortly thereafter, agents searched Whiteside's car on probable cause that it would contain evidence of drug trafficking. During their search, agents recovered the suspected counterfeit M30 pills that Ceesay had delivery to Whiteside, a firearm, and additional controlled substances. Following the seizure of the gun and drugs, Whiteside was taken into state custody on charges of drug trafficking.



U.S. Memo in Support of Detention - 22
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

In addition to the July 9, 2024, deal, Means also facilitated a transaction that Whiteside set up with Ceesay after he (Whiteside) was initially released from state custody (on July 10). Specifically, after Whiteside attempted, unsuccessfully, to reach Ceesay, Means called Ceesay to tell him "he [presumably Whiteside] was tryna holler at you yesterday. You catch up with [him]?" In a subsequent call, Means confirmed that Ceesay had contacted Whiteside, explaining "[i]t's good bro, I got him. I just went to the thing to go grab him, bro."

Following this apparent completed deal, Whiteside was taken back into state custody for shooting—not fatally—a homeless man living in an RV near where his car had been parked when agents searched it on July 9, 2024.

Finally, on July 13, 2024—after Whiteside was taken back into custody—Means called Ceesay and told him that "Mafia" [Whiteside] is "on vacation [in jail] right now … He went to vacation so … he wanted me to see if you can … link with the other OG. You know what I'm saying, I need like two or three boats." The "other OG" turned out to be Shannon Johnson, who co-defendant Poston delivered to later that day. Following the deal between Poston and Johnson, investigators contacted Johnson at his apartment complex and seized approximately 2,000 fentanyl pills from him.

When investigators searched Means residence on October 30, 2024, they located an address book with the name "Mo Ceesay." Immediately below that entry was the number for Saho's TT37, with the name "Buck"—which investigators know is Saho's nickname. Investigators also seized additional evidence of drug trafficking including latex gloves, as well as measuring spoons, Ziploc bags, and a digital scale—all with suspected drug residue on them (pictured below).

//

//

//

U.S. Memo in Support of Detention - 23
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

The facts set forth above establish that Means is danger. Specifically, Means coordinated multiple drug deals involving Ceesay, Whiteside, and Poston. Of note, it appears that Means coordinated the July 13, 2024, deal—on behalf of Whiteside—while Whiteside was in custody on aggravated assault charges. Moreover, as detailed in the Pretrial Services Report, Means—himself—also has extensive and violent criminal history relating to multiple weapons and assault charges. Indeed, based upon a review of the Pretrial Services Report, it appears that Means committed the instant offense conduct while still on probation for convictions of Unlawful Possession of a Firearm, Drive by Shooting, and/or Assault in the Second Degree – Domestic Violence.

Regarding flight risk, Means has extensive history of noncompliance on both federal and state supervision, and—according to the Pretrial Services Report—a history of failure to appear that has resulted in the issuance of nineteen bench warrants. The combination of Means' poor performance on both pretrial and posttrial supervision, a documented history of failure to appear, and the prospect of a ten-year mandatory minimum term of imprisonment makes Means an extreme flight risk.

Ultimately, Means presents a danger to the community and a risk of nonappearance, and he should be detained pending trial.

## VI.    CONCLUSION

For the reasons set forth above, the government respectfully submits that these defendants present a risk of nonappearance and a danger to the community and that no

U.S. Memo in Support of Detention - 24
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

condition or combination of conditions can reasonably assure their appearance or the safety

to the community. Each defendant should therefore be detained pending trial.

Dated this 3rd day of November, 2024.

Respectfully submitted,

TESSA M. GORMAN
United States Attorney

*/s/ Joseph C. Silvio*
JOSEPH C. SILVIO
MICHELLE JENSEN
Assistant United States Attorneys
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Phone: 206-553-1522
Fax: 206-553-4659
E-mail: joseph.silvio2@usdoj.gov

U.S. Memo in Support of Detention - 25
*U.S. v. Kuyateh, et al.*, CR24-186 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970